524 F.2d 127
 UNITED STATES of America, Plaintiff-Respondent,
v.
EVERETT MONTE CRISTO HOTEL, INC., Defendant,
Matthew D. Griffin, et al., Defendants-Appellants,
and
Veca Electric Company, Inc., Plaintiff in Intervention and
Cross-Appellant.
 Nos. 73-2981, 73-2987, 73-3019, 73-3041 and 73-3113.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 1, 1975.
 
 Edward J. Novack (argued), Williams & Novack, Everett, Wash., for appellant in No. 73-2981.
 William H. Wilson, Anderson, Hunter, Dewell, Baker & Collins, Everett, Wash., for appellant in No. 73-2987.
 Michael J. Hemovich (argued), Bantz & Hemovich, Spokane, Wash., for appellant in No. 73-3019.
 Newell Smith, Everett, Wash., for appellant in No. 73-3113.
 William B. Moore (argued), Ferguson & Burdell, Seattle, Wash., for appellant in No. 73-3041.
 Charles F. Mansfield, Asst. U. S. Atty. (argued), Seattle, Wash., for appellee.
 OPINION
 Before ELY and HUFSTEDLER, Circuit Judges, and TAYLOR,* District Judge.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 The Everett Monte Cristo Hotel, Inc. ("the Hotel"), was organized to operate a historical hotel in Everett, Washington. In an effort to obtain capital, the Hotel began negotiations for a Small Business Administration ("SBA") loan. After lengthy negotiations, an arrangement was made whereby SBA and several local financial institutions, the latter represented by Everett Trust and Savings Bank ("Bank"), agreed to lend the Hotel $400,000. SBA participation in the loan was $300,000.
 
 
 2
 SBA and the Bank signed a contract governing SBA participation in the loan (the "Participation Agreement," dated December 22, 1965). The Hotel thereafter signed a note, dated February 7, 1966, promising repayment of $400,000 principal plus interest. The note was secured by (1) a real estate and chattel mortgage on the hotel property dated February 7, 1966, and a supplemental chattel mortgage dated September 22, 1966, and (2) certain personal guaranties dated February 7, 1966 (discussed at length Infra ). Sometime in April 1967, the Bank assigned the note, mortgages, and guaranties to the SBA, pursuant to a clause in the Participation Agreement calling for such assignment upon SBA's demand.
 
 
 3
 By July of 1967, the Hotel had defaulted. Demand upon the guarantors for payment was made and refused. The United States brought suit against the Hotel in 1970 for payment of the note and foreclosure of the mortgages and against the guarantors for payment of the guaranties. After a brief court trial, judgment was entered for the SBA against the Hotel and the guarantors, and this appeal followed.
 
 
 4
 The appealing guarantors advance a variety of contentions to the effect either that they have no liability or that their liability is less than was determined by the court below. The guarantors' appeal is complicated by the differences among the various guaranties given. Consideration of the issues pressed must therefore begin by differentiating the variously situated guarantors.
 
 
 5
 A meeting between Bank, SBA, the Hotel, and the Everett Chamber of Commerce was held in fall 1965 as part of the course of the negotiations resulting in the loan. It is undisputed that personal guaranties by the Hotel's stockholders and their respective wives were discussed at this meeting. It clearly appears that after the meeting personal guaranties of some kind (the kind is disputed, See infra at 130) were contemplated by all parties concerned. This expectation was reflected in a "loan authorization" dated December 10, 1965, sent by the SBA to the Bank. The loan authorization provided in paragraph 3(b) that one condition of SBA participation in the loan was that security for the loan include guaranties "on SBA Form 148A" by all of the Hotel's nine stockholders and their respective wives. (The loan authorization was not itself made an exhibit at trial. However, the contents of paragraph 3(b) were read into the record, and at oral argument the panel ordered the loan authorization to be filed with the court.)
 
 
 6
 In fact the guaranties of all nine couples were never obtained. The Bank eventually obtained seven guaranties signed by couples and one guaranty signed only by shareholder Mr. Koutlas. The ninth shareholder, Mr. Peterson and his wife, never signed a guaranty. All these guaranties were dated December 7, 1966, parallel to the Hotel's note and first mortgage. The guaranty of one couple, the Currans, had two amending pages attached to it. The first, also dated December 7, 1966, limited the couple's liability to $44,000; the second, dated December 11, 1966, limited the Currans' liability to $75,000. For convenient reference this situation can be summarized as follows:
 
 
 7
 The Griffin Guaranties: guaranties signed by husband and wife. This group includes the guaranties of the Griffins, the Beards, the J. Kleins, and the E. Kleins. The group also contained the guaranties of the Johnsons, whose appeal is not involved here, and the Enfields, who failed to take an appeal.
 
 
 8
 The Curran Guaranty: guaranty signed by husband and wife but limited by amendment to the basic document.
 
 
 9
 The Koutlas Guaranty: guaranty signed only by husband.
 
 
 10
 The Petersons did not sign a guaranty.
 
 
 11
 Although the agreement that some personal guaranty be furnished was not disputed, there is considerable disagreement about the size of the required guaranty. This dispute centered on whether SBA agreed to waive guaranties so that only Bank's participation in the loan would be guaranteed. Since SBA participation in the loan was 75 percent, the agreement claimed by the guarantors would have limited their liability to 25 percent of the loan. The trial court entered judgment jointly and severally against all the signing guarantors, except the Currans, for the entire unpaid principal and interest. The joint and several liability of the Currans was limited to $75,000.
 
 
 12
 All the guarantors argued at trial (with varying degrees of clarity) and argue on appeal that they had no liability because of an unfulfilled condition precedent to the effectiveness of their guaranties. They argue that the condition precedent was that all nine stockholders and their respective wives sign identical guaranties. The evidence is clear that the Petersons and Mrs. Koutlas never signed and that the Currans signed a limited guaranty.
 
 
 13
 The guarantors' argument rests on the well-recognized defense against a guarantor's liability that may be stated as follows: When a guarantor delivers a guaranty subject to the condition precedent that others will also guarantee the debt, he is not liable unless the other guarantors do sign. (L. Simpson, Suretyship § 53 (1950): J. Elder, Stearns on Suretyship § 7.10 (5th ed. 1951).) Washington recognizes this principle. (See Williams v. Hitchcok (1915) 86 Wash. 536, 150 P. 1143, 1145.) If the guarantors could prove the existence of this defense against Bank, they would also have the defense against SBA as Bank's assignee unless they are estopped from asserting it. (See infra at 133-135.) However, this defense appears not to have been considered by the trial court under the proper principles of law and the record was not sufficiently developed to allow determination of whether the defense would have been properly rejected.
 
 Availability against Bank
 
 14
 The first issue in determining the availability to the guarantors of this defense is whether the defense was available against the Bank. The initial question is whether the Bank received the various guaranties subject to a condition precedent that they were to become effective only when all nine couples had signed. The guarantors argue that whenever the signatures of other guarantors are contemplated, the signatures are conditions precedent. One commentator takes this position. (See L. Simpson, Supra, § 53.) But Washington law appears to be that if other guarantors were merely contemplated, the signing guarantors are not insulated from liability; the missing signatures must actually have been agreed conditions precedent. (See Young v. Union Savings Bank & Trust Co. (1900) 23 Wash. 360, 63 P. 247; J. Elder, Supra, § 7.11.) The defense asserted thus demands two component inquiries: (1) Were the signatures of other guarantors contemplated at all? (2) Was the securing of the contemplated signatures a condition precedent to the effectiveness of the guaranties?
 
 
 15
 It is well settled that in assessing whether a condition precedent of other signers existed, parol evidence may be considered. (L. Simpson, Supra, § 53; J. Elder, Supra, § 7.18, at 226.) This rule is merely an application of the general rule that parol evidence may be used to show a condition precedent to a contract. (See, e. g., Lempco Products v. Phillips (1957) 51 Wash.2d 334, 317 P.2d 1060.) Parol evidence, of course, includes both oral and written evidence extrinsic to the contract.
 
 
 16
 There was parol evidence before the trial court establishing that guarantors other than those who eventually signed identical guaranties (I. e., the Petersons, Mrs. Koutlas, and the Currans) were at some point Contemplated by SBA, Bank, and the Hotel's stockholders. While less probative that the missing signatures were conditions precedent, some of the parol evidence had at least a tendency to indicate the existence of a condition precedent.
 
 
 17
 First, there was testimony from various guarantors that the understanding was that the signatures of all nine couples were required. Second, and more persuasive, there was evidence presented by two SBA documents. The first document, already discussed, is the loan authorization dated December 10, 1965, sent by SBA to Bank. This document called for the signatures of all nine couples. The second document was a letter dated March 2, 1966, responding to a Bank request to amend the loan authorization's collateral provisions to allow the Koutlas' guaranty to be signed by the husband only and the Currans' guaranty to be limited. SBA agreed to the amendments "subject to Bank's receiving from all guarantors advice that the foregoing changes have their approval." (Defendants' Exhibit 1.)
 
 
 18
 The testimony of the guarantors about their own understandings is of marginal relevance, since the asserted condition precedent can be effective against a creditor only if the creditor has knowledge of it. (See Williams v. Hitchcock, supra, 86 Wash. at 536, 150 P. at 1145; J. Elder, Supra, § 7.10.) But the SBA documents are stronger evidence that the asserted condition precedent may have existed. The SBA documents, sent to Bank, clearly gave notice to Bank that other guarantors were contemplated. At trial, an SBA employee testified that loan authorizations attempt to set forth the negotiated conditions arrived at by the parties. The loan authorization as originally issued called unambiguously for guaranties from all nine couples. Further, the March 2, 1966, letter requiring the Bank to obtain the consent of all guarantors to changes in the guaranties may have reflected a belief that the signatures of all nine couples were conditions precedent. It is worth noting that although the loan authorization is an SBA-Bank document, the original authorization and the letter concerning amendments were probably known to at least some of the guarantors. The SBA employee testified that SBA practice was to send a copy of loan authorizations to borrowers for their information. There was unambiguous testimony that Griffin and Curran saw the March 2, 1966, letter. Whether Griffin, the moving spirit in the Hotel in 1966 and counsel for many of the stockholders, saw the original loan authorization was less clear.
 
 
 19
 Thus the guarantors pressed before the trial court a theory and some supportive evidence that had the potential of relieving them from liability. The record on appeal strongly suggests that the trial court failed to give proper consideration to this defense because of a misapplication of the parol evidence rule.
 
 
 20
 The Government in closing argument appears to have contended that the parol evidence rule precluded consideration of parol evidence of a condition precedent of other signatures, and the trial court seems to have adopted that view. The findings of fact filed by the trial court make explicit findings that reject the factual prerequisites of some of the other defenses raised by the guarantors which involved consideration of parol evidence. (See infra at 133-134.) There is, however, no finding of fact about the existence of a condition precedent that all nine couples sign. The trial court could have failed to make a finding on this issue only if it believed parol evidence could not establish a condition precedent to the effectiveness of the guaranties.
 
 
 21
 If the failure to consider parol evidence was based on failure to recognize the "condition precedent" exception, the trial court was proceeding under a misapprehension of law. Nothing in the record below suggests that any consideration was given to the effect of the "nonsigner" clause of the guaranty contract. If the "nonsigner" clause embraced failures to sign related guaranties as well as the physically identical document, parol evidence directly contravening the clause would be inadmissible despite the "condition precedent" exception. (See Nelson Equipment Co. v. Goodman (1953) 42 Wash.2d 284, 254 P.2d 727.) But in the context of physically separate guaranties, the clause is ambiguous and the trial court, despite a general finding that the guaranties were unambiguous, seems not to have been alerted to this question. His general finding therefore ought not to be construed as a finding on the meaning of the "nonsigner" clause.
 
 
 22
 The proceedings below thus terminated without a proper consideration by the trial court of the possibility that an unsatisfied condition precedent to the effectiveness of the guaranties existed. Despite the evidence already discussed, particularly SBA documents, we cannot determine whether a condition precedent existed. First, as already noted, the effect of the "nonsigner" clause should be explored. Second, the mere fact that paragraph 3(b) of the loan authorization clearly contemplated the signatures of nine couples does not necessarily make the contemplated signatures conditions precedent; further facts must be developed. This is especially true in light of the conflicts in the "evidence" that were not pursued at trial, perhaps because of the misapprehension of the effect of the parol evidence rule. The most important of this "evidence" is the confusion surrounding Peterson's failure to sign. The guarantors place heavy reliance on his failure to sign, but some incompletely developed evidence suggests that his signature was not contemplated, much less a condition precedent, by February 7, 1966. As originally drafted the December 10, 1965, loan authorization called for Peterson's guaranty and that of his wife; this part of the loan authorization was read into evidence. But the loan authorization itself, lodged with the court on appeal although not an exhibit below, shows Peterson's name stricken out with the notation "deleted (undecipherable) 1-19-66." The mortgage executed parallel to the corporation's note and the guaranties named only the other eight stockholders and their respective wives as guarantors. Nothing in the record below explains the Petersons' deletion from the loan authorization.
 
 
 23
 The record thus leaves unconsidered and unresolved crucial issues of fact on the condition precedent defense. Further, even if the guarantors established a condition precedent of other signatures on identical guaranties, the record discloses facts which might estop the assertion of the defense against Bank. Williston indicates that a surety may sometimes be estopped to assert the defense of conditional delivery against an obligor. (4 S. Williston, Contracts § 1246, at 3571-72 (S. Williston & G. Thompson rev. ed. 1936).) Although no Washington case has been found directly on point, Williams v. Hitchcock, supra, 86 Wash. at 536, 150 P. at 1145 indicates that a condition precedent can "be subsequently dispensed with by the one who signed." There are facts pertinent to the possibility that some guarantors waived or are estopped to assert the absence of certain signatures. As already noted, the facts concerning the Petersons' failure to sign are undeveloped. In addition, an insufficient record was developed to allow any inference about the effect of Defendants' Exhibit 3, a form signed by all the stockholders except Curran and Koutlas consenting to the husband-only guaranty by Koutlas and the limited guaranty of the Currans.
 
 
 24
 The factual problems present by the consent form may be summarized as follows. Some evidence suggests that by December 7, 1966, the Petersons were no longer contemplated as guarantors. If one assumes Arguendo that the signatures of only the other eight couples were conditions precedent, all but Mrs. Koutlas and the Currans signed the full guaranty. SBA subsequently consented to waive Mrs. Koutlas' signature and limit the Currans' guaranty if all the guarantors consented. A consent form was circulated to and signed by all of the stockholders (I. e., the husbands) except Curran and Koutlas. This consent form may have put those who saw it on notice that any condition precedent of a full guaranty by Mrs. Koutlas and the Currans had not been met. (See 4 S. Williston, Supra, § 1246, at 3571 n.8.) On the other hand, the request for consent may suggest that neither Bank nor SBA was relying upon the condition precedent as met when Mrs. Koutlas and the Currans failed to sign full guaranties.
 
 Availability against SBA
 
 25
 Assuming that some or all of the guarantors can establish an unsatisfied condition precedent against Bank, the question remains whether they are nevertheless liable to SBA. In general, an assignee takes his rights subject to any defenses the obligor has against the original obligee. (2 S. Williston, Supra, § 432, at 1243.) An exception arises when "the debtor by the form of the instrument intrusted to the assignor . . . has estopped himself to set up a defense . . . ." (Id. § 432, at 1244; See 4 A. Corbin, Contracts § 899 (1951).) Such estoppel arises when the "obligor . . . so conducted himself as to induce the assignee to believe that the defense . . . that is later asserted did not exist and to change his position materially in reliance thereon." (4 A. Corbin, Supra, § 898, at 604.)
 
 
 26
 Here it is undisputed that SBA participated in the negotiations underlying the loan, and itself specified the conditions of the loan authorization, which originally included the obtaining of guaranties signed by the nine couples. Thus, SBA's role in the transaction suggests that it had notice of any condition precedent despite the absence of conditional language in the guaranties. In any event, the record left undeveloped the factual issues concerning the predicates for SBA's estopping the guarantors from asserting their defenses against the Bank.
 
 
 27
 Because of an apparent misapprehension of law, crucial issues in this case were neither explored nor resolved below. It thus appears that remand is both appropriate and necessary for a fair disposition of this case. On remand on the condition precedent issue the parties should have an opportunity to develop Washington law on the legal questions involved and to present evidence bearing on the issues. Consideration should be given to the following issues and their concomitant factual components: (1) What is the effect of the nonsigner clause? (2) What "contemplation" of other guarantors suffices under Washington law as a condition precedent? (3) Are any of the guarantors estopped to raise any condition precedent against Bank? (4) Are any of the guarantors estopped to raise any condition precedent against SBA?
 
 The Griffin guarantors and Koutlas
 
 28
 The appealing guarantors other than the Currans were found jointly and severally liable for over $400,000 in principal and interest. They advance several contentions for limiting their liability. The argument pressed hardest is that the guarantors understood and the contracts reflected that only 25 percent of the $400,000 loan (representing the participation of Bank) was to be guaranteed.
 
 
 29
 The evidence upon which this contention is based comes largely from the testimony of various guarantors that they understood that they would be required to guaranty only 25 percent of the loan. The possible existence of such an "understanding" is somewhat bolstered by further testimony that at the fall 1965 meeting there was some discussion about SBA's waiving guaranties as to its participation in the loan. However, there was also testimony from an SBA employee suggesting that discussion of the guaranty waivers was related to a possible "local development company" loan, a type of loan for which the corporation did not qualify. (Such loans are authorized by 15 U.S.C. § 696.) There was further testimony by the SBA employee that personal guaranties were virtually always required under the lending authority pursuant to which the loan here was made. (The lending authority relied upon here was 15 U.S.C. § 636.) The other evidence relied upon in support of the 25 percent guaranty limitation is the face of the guaranty contracts themselves. In accommodating the standard guaranty form to the specifically negotiated terms of this loan, the form appeared as follows: "(T)he undersigned hereby unconditionally guarantees to Bank . . . payment when due . . . of the principal of and interest on . . . the note of the (Hotel) . . . in the principal amount of $400,000, with interest at the rate of 61/2 percent per annum on 25% Of the loan outstanding and at the rate of 51/2% Per annum on the remaining 75% Of the loan outstanding."
 
 
 30
 Relying on the parts of this evidence favorable to themselves, the Griffin guarantors and Koutlas contend: (1) in several ways that the agreement reached by the parties called for only a 25 percent guaranty, (2) that there was "scrivener error" in reducing the agreement to writing, and (3) that the language and physical arrangement of the contract made it ambiguous and that the ambiguity should be resolved in their favor.
 
 
 31
 The trial court made a finding of fact rejecting these arguments. Finding of Fact 7 states in part: "The guaranty contracts are clear and unambiguous. There was no mutual mistake of fact regarding the guarantees (sic) as between (Bank and SBA) on the one hand and the guarantors on the other. There was no scrivener's error on preparing the guaranties. There was no fraud or unconscionable conduct on the part of" Bank or SBA.
 
 
 32
 Finding 7 suggests that in dealing with these contentions the trial court correctly applied the parol evidence rule that is, it considered and disbelieved evidence tending to prove that the contracts signed did not represent the bargain. And the guarantors do not urge any misapplication of the parol evidence rule infected the findings of fact on these issues. The question therefore becomes whether these findings are clearly erroneous. We conclude that they are not.
 
 
 33
 Arguments (1) and (2) advanced by the guarantors depend upon the agreements being for 25 percent guaranties, but there was sufficient evidence from the testimony about SBA practices and about the discussion of a "local development company" loan for the trial court to conclude that there was no 25 percent limitation as to the loans made. Argument (3) depends upon the interpretation of the contracts' language and physical appearance. The language is not really susceptible to the alleged 25 percent limitation interpretation. The guaranties provide for payment of "the principal of and interest on . . . the note of the (Hotel) . . . , in the principal amount of $400,000.00, with interest at the rate of 61/2 percent per annum on 25% Of the loan outstanding*/* and the rate of 51/2% Per annum on the remaining 75% Of the loan outstanding." The comma following "$400,000.00" sufficiently separates the principal amount from "25% Of the loan outstanding" to indicate that that restriction goes to the interest rate. This conclusion is not diminished by the broken interlineation of "on 25% Of the loan outstanding*/* and at the rate of 51/2% Per annum on the remaining 75% Of the loan outstanding." The typewritten interlineation is quite distinctive from the type face of the note, being considerably larger. Further, the material following the asterisk appears immediately to the left of the signature lines. It is thus difficult to disagree with the lower court's conclusion that the language and appearance of the contract clearly indicated that 100 percent of the debt was guaranteed.
 
 
 34
 Another line of argument is advanced by the Griffin guarantors and Koutlas to support a limitation on their liability. In essence, it is a principle of guaranty law that an obligee releasing one guarantor also discharges all other guarantors the amount of discharge differing in various jurisdictions. From this principle the Griffin guarantors and Koutlas argue that their liabilities were discharged in part by the release of the Currans. Thus, consideration of this contention is best deferred until the Currans' liability is discussed.
 
 The Currans
 
 35
 The Currans were found jointly and severally liable with the other guarantors, but their liability was limited to $75,000 on the basis of the December 11, 1966, amendment to their guaranty. As do the other guarantors, the Currans argue in addition to "no liability" arguments that their liability was miscalculated.
 
 
 36
 The Government's amended complaint, upon which the trial was conducted, prayed for judgment against the Currans limited to $75,000. The signatures of both Currans appear on a "full guaranty" form dated February 7, 1966, identical to that signed by the other guarantors except for a notation to see the attached amendment. Attached to this guaranty are two amendments. The first, also dated February 7, 1966, provided that the Currans' guaranty would be limited to $44,000. This amendment was signed by Mr. Curran, but lines provided for the signatures of Mrs. Curran and of a bank officer were left blank. The second amendment is dated February 11, 1966, and provides that the Currans' guaranty shall be limited to $75,000. This form was signed by Mr. Curran and a bank officer; there was no signature line provided for Mrs. Curran. The limited liability for the Currans was not contemplated by the original loan authorization sent from SBA to Bank dated March 2, 1966, which reads in pertinent part: "Reference is made to your letter of February 21, 1966 recommending certain changes in the subject Loan Authorization. The Loan Authorization is hereby amended as follows:
 
 
 37
 "(1) In paragraph 3-b delete the names of Panos C. Koutlas and Joseph V. Curran.
 
 
 38
 "(2) Add the following subparagraph to paragraph 3:
 
 
 39
 " . . . .he
 
 
 40
 " 'd. Guaranty on SBA Form 148A of Joseph V. Curran and his wife modified to provide that the liability under the guaranty of the husband and wife community shall be limited to $44,000.'
 
 
 41
 "(The above changes in the guarantors are subject to Bank's receiving from all guarantors advice that the foregoing changes have their approval.)"
 
 
 42
 A form dated February 11, 1966, consenting to the limited guaranty was signed by seven of the nine stockholders of the Hotel, but not by Curran, Koutlas, or any of the shareholders' wives. The record leaves unclear whether this document was ever forwarded to Bank; it appears not to have been forwarded to SBA.
 
 
 43
 From this evidence the Currans argue that their liability should have been limited to $44,000. In so arguing they seek to bring their case within the principle that contracts will be reformed if (1) mutual mistake appears or if (2) one party has made a mistake and the other has engaged in equitable conduct. The combination of mistake and inequitable conduct sufficient to call for reformation arises when "one party knew exactly what was in the (document) and that it did not contain the (term) the other party believed it contained." (Gammel v. Diethelm (1962) 59 Wash.2d 504, 508, 368 P.2d 718, 721.)
 
 
 44
 Finding of Fact 7, quoted Supra at 134, applied to the Currans' contention. In it the court found no mutual mistake and no inequitable conduct by the Bank or SBA. Based on these findings, the court held the Currans' liability to be $75,000. If the court's findings are correct (I. e., not clearly erroneous), judgment against the Currans was properly given for $75,000. The problem is that, as to the Currans, Finding 7 seems without support because as is typical of this case the record developed below failed to illuminate this issue.
 
 
 45
 The Currans' contention may best be viewed as one that the Bank prepared and had Curran sign the $75,000 amendment knowing that he believed it to be a $44,000 amendment. In support of this contention the Currans both testified that they believed the amendments were to limit liability to $44,000. Mr. Curran further testified that Bank prepared the documents and he signed them without reading them. Their contention that their liability was to be limited to $44,000 finds further support in the post-amendment correspondence between Bank and SBA, which apparently reflected pre-amendment communications. Defendants' Exhibit 1, the SBA response to proposed amendments to the SBA loan authorization, makes reference to a February 21, 1966, letter seeking amendment of the loan authorization to limit the Currans' liability to $44,000.
 
 
 46
 This evidence reveals that as of March 2, 1966, several weeks after the date of the $75,000 amendment, Bank and SBA were both talking of the Currans' guaranty in terms of $44,000. This evidence lends considerable support to the Currans' contention that Their belief was that their liability was limited to $44,000 and that such was Bank's understanding. On the basis of this evidence it seems that the Currans have made a prima facie case of mistake plus inequitable conduct (or mutual mistake). There is no evidence in the record upon which the trial court could have relied to reject their case. The only testimony on the course of the transactions eventuating in the Curran amendments was that Bank itself handled the problems resulting from the Currans' balking (and that of Mrs. Koutlas). No bank officer was called by the Government to discuss the dealings with Curran that led to the two amendments. In the state of this evidence it is difficult to see that the Currans' case for the effectiveness of the guaranty being limited to $44,000 has been overcome, and the trial court's finding appears to be without evidentiary support. On remand the district court should take further evidence on the issue of the amount of the Currans' liability (if any). If it determines that the amount of the Currans' liability to Bank was limited to $44,000, it should also consider whether the February 21, 1966-March 2, 1966, correspondence between Bank and SBA sufficed to notify SBA of any $44,000 limitation on liability.
 
 The release issue
 
 47
 As previously noted, Supra at 134, the Griffin guarantors and Koutlas connnnnntend that thhhhhe release of the Currans' liability partially discharged them. This issue was properly pressed at trial but the findings of fact and conclusions of law do not address it, suggesting that the trial court did not consider the issue.
 
 
 48
 On remand the trial court should consider the release contentions of the guarantors other than the Currans. The first question is whether there was in fact any release of the Currans. If their liability was always limited, they were never released from any of their guaranty liability. The trial court must therefore reconstruct the sequence of events to determine whether the Currans were partially released from a full guaranty or simply signed a limited guaranty.
 
 
 49
 If the court determines that the Currans were partially released from their guaranty, it must next determine what effect that has on the other guarantors. They contend on appeal that discharge occurs unless the releasing document specifically reserves rights against the coguarantors. No such reservation appears here. However, it appears that discharge upon release can also be avoided in other ways.
 
 
 50
 First, a coguarantor could contract to allow release of another without discharge as to him. (See 4 S. Williston, Supra, § 1223 (dealing with the analogous problem of discharge upon extension of time).) The guaranty contract here provided, in part, that "(t)he undersigned hereby grants to Bank full power . . . subject to the provisions of any agreement between Debtor or any other party and Bank at the time in force, to deal in any manner with . . . the collateral, including . . . (d) To consent to the . . . release of all or any part of the collateral . . .." "Collateral" is defined as, Inter alia, "guaranties . . . which may have been, are, or hereafter may be . . . delivered . . . by or on behalf of the Debtor or the undersigned or any other party to Bank . . .." This clause may allow the Bank selectively to release guarantors unless some other agreement prevents that result. The participation Agreement between SBA and Bank, P 10, provides in part: "That (the) holder (of the note from the Hotel) shall not (except to the extent permitted by the Authorization) . . . (b) make or consent to any release . . . of any of said collateral . . .." It thus appears that there was an agreement between "any other party and Bank" limiting the right of Bank to deal with collateral. If the Bank partially released the collateral given by the Currans, it did so other than in conformity with the Participation Agreement, since the limited guaranty signed by the Currans was not authorized by the loan authorization or any effective amendment to it. (The conditions for the amendment set out in the March 2, 1966, letter never having been met, there was no effective amendment.) Since the power of Bank to release collateral was limited by the Participation Agreement, the other guarantors had not absolutely contracted away their defense based on the release of coguarantors.
 
 
 51
 The protection, however, may also be lost by consent or waiver. (J. Elder, Supra, § 645.) Some of the guarantors here may have lost their claim to discharge in signing Defendants' Exhibit 3, the consent form signed by the seven stockholders.
 
 
 52
 On remand the parties should be given an opportunity to develop Washington law on the issue of discharge. Then, after the trial court determines the Currans' liability, it should determine whether any of the guarantors were discharged vis-a-vis Bank by any partial release of the Currans, and the extent of any such discharge. Finally, it should consider whether the defense is available against SBA.
 
 
 53
 Cross-Appeal of Veca Electric Company, Inc.
 
 
 54
 The suit filed by the United States against the corporation and the guarantors was commenced in mid-1970. In late 1971 a plan was put into effect to try to salvage something from the crumbling situation. As with the appeals of the guarantors, the facts surrounding this plan were sketchily developed at trial. Moreover, they are misleadingly portrayed in both briefs on the cross-appeal. They will therefore be stated as fully as possible here.
 
 
 55
 In December 1971, management of the corporation had been at least somewhat reshuffled. Griffin, who had been President of the Hotel at the time of the loan, was no longer an officer or a director. According to somewhat uncertain trial testimony, the directors in late 1971 were Curran, Koutlas, and a Jack Brown. Brown was not a stockholder. No explanation was provided for his assumption of a role in the Hotel.
 
 
 56
 Brown decided that the fortunes of the Hotel might be revived by converting the Hotel Monte Cristo into an office building and renting it to a state agency. This conversion would necessitate extensive rewiring of the building. Brown testified that he broached his plan to the other directors Curran and Koutlas and to Griffin. Brown further testified that at least some of these discussions involved several people, though his testimony left unclear whether there was a formal board meeting on the subject. He also testified that he had the oral approval of Curran, Koutlas, and Griffin to undertake the renovations necessary to rent the building to the state. There was no contrary testimony from Curran, Koutlas, or Griffin. Finally, he testified that he sought written authorization for the scheme, that the authorization was drawn up, that he signed it (as a director), that Curran and Griffin told him the authorization would be forthcoming, but that it never was.
 
 
 57
 The evolution and oral approval of Brown's scheme appear to have taken place in December 1971. Brown apparently next contacted Veca Electric Co., Inc. ("Veca") to do the necessary rewiring. Before Veca commenced work, Brown secured a document from Griffin dated December 29, 1971, addressed to Brown, which reads: "I will guaranty to see that the electrical contractor is paid for temporary wiring required to place the state of Washington, Department of Social Services in the Monte Cristo Hotel on a six months temporary lease provided I hold a valid assignment of lease proceeds securing me in the amount of the wiring and that the cost does not exceed $2,500." (Intervenor's Exhibit 32.)
 
 
 58
 The circumstances surrounding the procuring of the document and the use to which it was put are obscure. No testimony was adduced from Brown on these matters. Griffin's testimony was somewhat vague. He first stated that "(Brown) wanted to deliver a letter of (Veca)." He later said: "(I)t was requested at that time that Mr. Brown that Veca Electric wanted to have a personal guarantee on the work and they told me the work would be $2,500 . . . . (sic)" By "they told me" Griffin appears to have meant "Brown told me," since he testified to never having contact with Veca. So far as appears from the record, Griffin's letter was never forwarded to Veca. (See Finding of Fact No. III, R. at 139.) Further, the record does not show that Veca was informed of the content of the letter.
 
 
 59
 After Brown secured the letter from Griffin, Veca expended approximately $6000 on goods and services in remodeling. The resulting bills were sent to Griffin personally, because Brown never told Veca of the existence of the Hotel corporation. Griffin refused to pay. Veca "duly and timely" filed a lien against the Hotel, naming Griffin as the owner. (Finding of Fact No. IV, R. at 139.)
 
 
 60
 Veca eventually became an intervenor in the United States' action against the Hotel and the guarantors. (This is unclear because the record contains no pleadings by Veca; its brief lists all of the guarantors except the Enfields as "principal defendants" against whom they sought judgments. Brief for plaintiff in intervention at 2 n. 2 & 6. The omission of the Enfields is not explained.) The case was part of the one-day trial held in the main action. The trial court denied relief to Veca. The court's reasons appear more fully in the transcript than in the conclusions of law. The trial court found the lien invalid because Brown had not been authorized to make the contract on behalf of the Hotel. Relief was denied against the guarantors because they did not authorize the work. Conclusion of Law II, R. at 140.) The trial court considered Griffin's letter a guaranty the condition precedent of which had not been met and so denied recovery on it.
 
 The lien
 
 61
 Rev.Code Wash. § 60.04.010 provides: "Every person performing labor upon, furnishing material . . . to be used in the construction, alteration or repair of any . . . building, . . . has a lien upon the same for the labor performed (or) material furnished . . ., whether performed (or) furnished . . . at the instance of the owner of the property . . . or his agent; and every . . . person having charge, of the construction, alteration or repair of any project subject to the lien as aforesaid, shall be held to be the agent of the owner (of the property) . . . ."
 
 
 62
 Thus, if Brown was the agent of the Hotel corporation, Veca obtained a lien by doing work at this bidding. In rejecting the validity of the lien, the trial court relied on the fact that Brown had never obtained Written authorization for the renovation scheme. Although Veca complains of the ruling on the lien, it does not brief the issue nor do the responding guarantors (the Griffin guarantors). Nonetheless, it appears that under general principles of corporation law Brown may have been properly authorized.
 
 
 63
 Ordinarily a director cannot contract for the corporation as an individual. But actual authority to act individually as a corporate agent may be conferred on a director. (19 C.J.S. Corporations § 1000 (1940).) The trial court erred in making the existence of a written authorization determinative. Where actual authority for a director to act as an agent is needed, the general rule is that it may be conferred by the directors as a group by parol (I. e., it need not be entered formally of record). (19 C.J.S. Corporations §§ 748, 1008 (1940).) There was testimony here that strongly suggests that authority to act as an agent was actually conferred on Brown by the unanimous consent of the three directors (Brown, Curran, and Koutlas). The primary factual problem is whether there was ever a sufficiently formal meeting of the Board of Directors to constitute director action. (See 19 C.J.S. Corporations § 745 (1940).) The record is not susceptible to determination of this issue, and this court does not have the advantage of the parties' and the trial court's investigation of Washington law on this point. Therefore, the validity of the lien should be reconsidered on remand in light of Washington law governing the conferring on a director of agency to act for the corporation.
 
 
 64
 Griffin did not purport by his letter to authorize anything on anyone's behalf. Rather, his letter was a guaranty for a contract in which the Hotel was the principal. Brown appears to have unilaterally contacted Veca to do the work, subsequently turned to Griffin for a guaranty, and then put Veca to work. (Supra at 137-138.) Brown's contact with Veca before any document was solicited from Griffin suggests strongly that Griffin's letter was not an "authorization," but a guaranty for a contract on behalf of the Hotel corporation.
 
 
 65
 Thus, it appears that Brown, if he was anyone's agent, was the agent of the Hotel corporation. If Griffin is liable it is because he is liable on his guaranty, not because he was Brown's principal. Two lines of reasoning suggest that he was not liable on the guaranty.
 
 
 66
 The first line of reasoning is simply that no valid guaranty contract was formed. The fact that the guaranty was addressed to Brown rather than Veca would not prevent the formation of a valid guaranty contract. (Cf. L. Simpson, Supra, § 20.) However, one or two prerequisites for formation of a valid guaranty contract are missing here. (1) It appears that Griffin's letter was never delivered to Veca. Delivery is necessary to the validity of a written guaranty. (See J. Elder, Supra, § 2.9.) (2) It seems clear that Veca never knew the terms of the guaranty. But the general principles of offer and acceptance apply to guaranty contracts. Griffin's letter was either an offer of a guaranty contract or a response to an offer from Veca to enter a guaranty contract. In the latter event it was almost certainly a counteroffer in light of the condition about the assignment of rents. Since Veca appears never to have known of the guaranty's terms, it cannot have accepted it by relying upon it. (J. Elder, supra, § 2.8.) Thus, Griffin and Veca never entered a guaranty contract, and Griffin is not liable on his mere offer or counteroffer.
 
 
 67
 It is possible that facts not appearing on the record would alter this analysis. However, in light of Veca's previous insistence at trial and on appeal of ignorance of the terms of the guaranty, it seems that remand is not needed to conclude that Griffin was not liable on the guaranty because no contract was formed.
 
 
 68
 A second line of reasoning leads to the same result. Even assuming Veca knew the terms of the guaranty, the condition precedent to Griffin's liability of the rent assignment never occurred. A guarantor is entitled to insist on fulfillment of any conditions precedent to liability. (See J. Elder, Supra, § 7.18.)
 
 The guarantors as a group
 
 69
 Only Curran, Koutlas, and Griffin have potential personal liability. The others had no dealings with Brown or Veca, and their status as stockholders provides no foundation for any liability to Veca. Curran, Koutlas, Griffin and Brown assumed to act as agents for Hotel, but the presence of the Hotel entity was undisclosed to Veca. So far as their liability to Veca is concerned, it is immaterial whether they were or were not actually authorized to act for or to bind Hotel, because agents of an undisclosed principal are liable personally to third persons with whom they contract, with exceptions not here pertinent. (Restatement (Second) of Agency, Supra, § 322; See also § 186, comment b.) The sketchy record does not disclose any direct dealings between Veca and Curran, Koutlas, or Griffin, but the record does adequately reveal that these three authorized Brown to undertake the renovations. Brown thus became their subagent. Agents of subagents are liable as if they were principals. (Restatement (Second) of Agency, Supra, § 255.)
 
 
 70
 The record is inadequate to permit us to determine what Brown told Veca about his relationship to Curran, Koutlas, and Griffin, but it does appear that Veca knew about Griffin, assumed that he was the owner, and sent him the bills. Griffin thus became in legal contemplation a disclosed principal. He is personally liable to Veca upon the contract made by Brown acting within his actual or apparent authority. (Restatement (Second) Agency, Supra, § 144.) Curran's and Koutlas' roles were not disclosed to Veca, and they are, therefore, deemed undisclosed principals. They, too, are liable to Veca for Brown's acts within the scope of his authority.[1] (Restatement (Second) Agency, Supra, § 186; Cf. Matsko v. Dally (1956) 49 Wash.2d 370, 301 P.2d 1074.)
 
 
 71
 The record is not sufficiently developed to permit us to decide the ultimate questions of the existence and the extent of the liability of Koutlas, Curran, and Griffin to Veca. We do not know the extent of Brown's actual or apparent authority to act for that trio. We do not know any of the details of Brown's dealings with Veca. (See, e. g., Restatement (Second) Agency Supra, §§ 146, 159, 161, 164, 188, 195.) The pertinent facts can be brought out on remand.
 
 
 72
 The judgments are reversed and the causes are remanded for a new trial.
 
 
 
 *
 Honorable Fred M. Taylor, District of Idaho, sitting by designation
 
 
 [1]
 Again, it is immaterial to the issue of liability to Veca whether Curran, Koutlas, and Griffin were, or thought they were, acting only as agents for Hotel, because the role of Hotel was not disclosed to Veca. We are not concerned with the liability Inter sese between and among Curran, Koutlas, Griffin, Brown and Hotel